UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
:
JANE DOE, :
:
      Plaintiff, :  ECF Case   1:25-cv-912 (ECC/DJS)
:
      - against - :
:
NEW YORK STATE OFFICE OF :
MENTAL HEALTH and :
MATTHEW CANUTESON, :  **COMPLAINT**
:  **AND JURY DEMAND**
      Defendants. :
:
:
---------------------------------------------------------------x

    Plaintiff Jane Doe, by her attorneys, Bantle & Levy LLP, as and for her complaint against Defendants the New York State Office of Mental Health and Matthew Canuteson, alleges as follows:

### NATURE OF THE ACTION

    1.    This is an action for employment discrimination based on sex and retaliation for opposing workplace discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (the "NYSHRL"). Plaintiff also asserts a claim for rape pursuant to N.Y. C.P.L.R. § 213-c, which confers a private right of action for certain violations of the New York Penal Code, including sexual assault. Plaintiff seeks monetary and declaratory relief on these claims.

    2.    Plaintiff, Jane Doe (hereinafter referred to as "Plaintiff"), was employed by the New York State Office of Mental Health ("OMH" or the "Office").

3. During the course of her employment at OMH, Plaintiff was subjected to a hostile work environment, including *quid pro quo* sexual harassment and sexual assault by her direct supervisor, OMH's Chief Diversity Officer Matthew Canuteson ("Canuteson").

4. Specifically, over the course of four months, Canuteson, while serving as Plaintiff's direct supervisor, sent her literally dozens of sexually explicit and graphic text messages and photographs, and pressured Plaintiff into submitting to unwelcome and non-consensual sexual acts in the workplace.

5. When Plaintiff finally stood up to her harasser and demanded that Canuteson cease and desist his sexualized conduct, Plaintiff's employment at OMH was abruptly terminated.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) as all claims share a common nucleus of operative fact as to form part of the same case or controversy.

8. Venue is properly laid in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in New York and one or more of the Defendants may be found in this state.

9. All conditions precedent to jurisdiction have occurred or been complied with:

   a. Plaintiff filed a Charge of employment discrimination on the basis of sex and retaliation with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse actions of which Plaintiff complains in this action.

      b.      The EEOC issued a Notice of Right to sue in this matter on or about June 25, 2025.

      c.      This Complaint has been filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

## PARTIES

10.    Plaintiff Jane Doe is a female citizen of the United States who at all times relevant herein resided in the State of New York.

11.    Plaintiff was employed by the New York State Office of Mental Health from in or about February 2023 until her abrupt termination on June 22, 2023.

12.    Upon information and belief, defendant OMH is an executive agency that operates psychiatric centers, treatment facilities, and field offices across the State of New York.

13.    At all relevant times herein, OMH is a person within the meaning of §701(a) of Title VII.

14.    At all times relevant herein, OMH was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the NYSHRL, N.Y. Exec. L. § 292(5).

15.    At all times relevant herein, OMH is a person within the meaning of Title VII, 42 U.S.C. § 2000e(a) and the New York Executive Law § 292(1).

16.    Upon information and belief, defendant Matthew Canuteson is a male citizen of the United States and a resident of the State of New York.

17.    Upon information and belief, at all relevant times hereto, Canuteson was OMH's Chief Diversity Officer.

## STATEMENT OF FACTS

**Plaintiff Commences Employment with Defendants**

18. Plaintiff commenced employment at OMH in or about February 2023 as an Equal Opportunity Specialist 4.

19. Plaintiff's New York State designation was Equal Opportunity Specialist 4.

20. In her capacity as an Equal Opportunity Specialist 4, Plaintiff was responsible for, *inter alia*, leading the Bureau of Reasonable Accommodations within the Office of Diversity and Inclusion, as well as managing the Bureau and its staff.

21. Throughout her tenure at OMH, Plaintiff reported to, and was directly supervised by, Canuteson.

22. Throughout Plaintiff's tenure at OMH, Canuteson and Plaintiff interacted on a daily basis, with Canuteson actively involved in directing Plaintiff's daily activities and providing supervisory direction at his discretion.

**Canuteson Pressures Plaintiff Into a Sexual Relationship**

23. Commencing on or about March 6, 2023, approximately one month after she started working at OMH, Canuteson began aggressively and relentlessly pressuring Plaintiff to engage in a sexual relationship with him.

24. Specifically, Canuteson sent Plaintiff a series of sexually explicit, offensive, and graphic texts messages to Plaintiff, in which Canuteson described various sex acts he wanted to perform with and on Plaintiff.

25. For example, in texts he sent to Plaintiff in early March 2023, Canuteson wrote, "I want to slide my cock in you"; "I think about working on your pussy a lot … deep"; "and slow … to slap your ass" and "Jesus ... want to fuck you so bad".

4

26. Canuteson also sent Plaintiff graphic photographs of his penis.

27. During his sexual pursuit of Plaintiff, Canuteson texted Plaintiff literally hundreds of times – both during the workday and after work hours – with many of these texts containing sexualized and graphic material.

28. Although Plaintiff was uncomfortable with receiving sexualized communications from her direct supervisor, she felt obligated to participate in the sexualized texting with Canuteson for fear of her job being put in jeopardy.

29. In order to try to placate Canuteson and stay in his good graces in light of the control he exercised over her ongoing employment, Plaintiff felt compelled to respond in kind to his flirtations and, thus, initially was unable to demand that Canuteson cease and desist from his sexualized conduct in the workplace.

30. In order to keep herself in Canuteson's good graces and avoid putting her job in jeopardy, Plaintiff regularly responded in kind to Canuteson's sexualized communications.

31. In addition to texting Plaintiff about his desire for a sexual relationship, Canuteson was inappropriately flirtatious in the workplace on many of the days when both he and Plaintiff were present in the OMH office.

**Canuteson Twice Sexually Assaults Plaintiff**

32. On March 17, 2023, both Plaintiff and Canuteson were present in OMH's offices.

33. Late in the afternoon on March 17, 2023, Canuteson initiated a sexual encounter with Plaintiff in her office.

34. Canuteson walked into Plaintiff's office, closed the door, and after a few minutes of pacing and engaging her in small talk, locked her office door without Plaintiff's consent.

35. Plaintiff was alarmed by Canuteson locking the office door, but was too scared to object, as she believed that Canuteson could and would physically overpower her if she tried to pass by him to open the door and leave the office.

36. After locking the door to Plaintiff's office, Canuteson walked over to where Plaintiff was sitting, placed his hands on her body and began rubbing her shoulders, hips, and breasts.

37. Thereafter, Canuteson raised Plaintiff's dress and caressed, squeezed, and smacked her buttocks, and pushed his crotch up against her body.

38. Canuteson said nothing while he rubbed Plaintiff's body with his genitals and pushed up against her.

39. Plaintiff was frozen with fear, anger, and confusion while Canuteson was touching her and rubbing up against her body, virtually unable to speak or move.

40. She feared that if she objected to Canuteson's advances, she could be subject to retaliation, including the possibility of losing her job.

41. For that reason, and because Canuteson's assaultive conduct triggered remembrance of past traumas that she had endured, Plaintiff remained passive throughout the entirety of sexualized interaction.

42. After a few minutes of rubbing Plaintiff and pushing up against her, Canuteson abruptly stopped his forcible touching of Plaintiff, turned away from her, opened her office door and walked out of her office.

43. Moments after leaving her office, Canuteson notified Plaintiff that he was leaving for the day and left OMH's offices.

44.     That same evening, feeling debased, shameful and angry, Plaintiff reached out to Canuteson and told him that his conduct in her office had made her uncomfortable and that she would not submit to his sexual advances.

45.     Plaintiff further told Canuteson that physical contact between them simply could not happen again and expressed a desire for a normalized professional relationship that did not include a sexual component.

46.     Canuteson claimed to understand Plaintiff's desire to have a non-sexualized relationship with him, and indicated he would respect her wishes.

47.     Despite Plaintiff's unequivocal admonition to Canuteson that further physical contact with him was unwelcome, and despite his stated willingness to refrain from sexually pursuing Plaintiff, Canuteson continued to aggressively pursue sexual contact with her.

48.     Canuteson's continued harassment of Plaintiff included additional sexualized text messages and overtly flirtatious behavior when they were together in the office.

49.     On or about May 3, 2023, after several weeks of continued sexual harassment, Canuteson initiated a second sexual encounter with Plaintiff in OMH's office.

50.     The May 3, 2023 encounter, which also occurred in the late afternoon, started much like the prior encounter.

51.     Canuteson walked into Plaintiff's office, closed and locked the office door, and began touching her above her clothing.

52.     On this occasion, Canuteson kissed Plaintiff on her face and body, lifted her dress and directly touched her buttocks and vagina with his fingers and hands, and then pushed her down on the desk and vaginally penetrated her with his penis.

53. After no more than a minute of penetrating Plaintiff with his penis, Canuteson stopped, pulled his pants up and walked out of her office.

54. As with the encounter on March 17, 2023, Canuteson said nothing during the entirety of the assault.

55. As with the encounter on March 17, 2023, Plaintiff did not give her consent to the sexualized physical contact and did not actively participate.

56. Again feeling paralyzed by fear and confusion, Plaintiff was silent throughout the entirety of the time Canuteson was in her office and barely moved during the physical encounter.

57. Once again, Plaintiff simply tried to endure what was happening to her as if she was a non-participant observer.

58. Subsequent to the May 3, 2023 sexual encounter, Plaintiff repeatedly advised Canuteson that his co-mingling of a professional and personal relationship with her made her extremely uncomfortable.

59. In response, Canuteson emphasized how much he "valued" Plaintiff professionally and promised to be more mindful of the distinction between the personal and professional in their communications.

60. Notwithstanding these assurances, however, it became increasingly clear to Plaintiff that Canuteson was unwilling or incapable of maintaining a strictly professional relationship with her.

61. Instead, in a wanton abuse of his power, Canuteson continued to subject Plaintiff to unwelcome sexualized comments and treatment.

62. Canuteson also inappropriately discussed Plaintiff with other employees of OMH, including without limitation, Melody Tien, who advised Plaintiff that Canuteson's frequent comments and questions about Plaintiff made her extremely uncomfortable.

**Canuteson's Sexualized Treatment of Plaintiff Constitutes Sexual Harassment**

63. Canuteson's actions subjecting Plaintiff, a direct report, to severe and pervasive sexualized treatment constitute sexual harassment by a New York State employee.

64. As Canuteson and OMH should be aware, the State of New York has a clear and unambiguous policy that every State employee is entitled to a work environment free from sexual harassment.

65. The State of New York expressly recognizes that verbal or physical contact of a sexual nature constitutes sexual harassment where, as here, submission to the sexual conduct is a term and condition of an employee's employment and/or an employee's submission to or rejection of the conduct is used as the basis for employment decisions.

66. As set forth in the New York State Handbook for Employees of New York State Agencies, it is not a requirement that the victim of sexually harassing conduct advise the perpetrator that the conduct is unwelcome and is not determinative of whether the employer is liable.

67. That Canuteson's conduct constitutes sexual harassment by a New York State employee is particularly clear where, as here, a supervisor engages in so-called *quid pro quo* harassment.

68. That Canuteson pursued and consummated this sexual relationship with Plaintiff while he exerted control over her daily work life and prospects for continued employment as her

9

direct supervisor is reprehensible and was undertaken willfully and in reckless disregard of applicable New York State standards for its supervisory employees.

69. Upon information and belief, Canuteson was forced to resign his position at OMH in lieu of termination based on his sexual harassment of Plaintiff.

**Canuteson Retaliates Against Plaintiff**

70. In or about late May 2023, Plaintiff ceased engaging in sexualized texting and flirtatious conduct with Canuteson.

71. In the following weeks, Plaintiff made a concerted effort to confine the substance and breadth of her interactions with Canuteson to exclusively professional content.

72. In response to Plaintiff's unwillingness to continue to engage in sexualized communications with him, Canuteson became increasingly confrontational with Plaintiff and, for the first time since the start of her employment, began to criticize her work.

73. On June 21, 2023, Plaintiff called Canuteson and raised concerns about his hostile and dismissive treatment of her over the prior weeks.

74. In response, Canuteson expressed remorse about how his pursuit of a personal relationship with Plaintiff had negatively impacted their professional relationship and had made the workplace "toxic" for her.

75. Canuteson vowed to Plaintiff that he would "start new," including promising to provide her more professional support and make her job easier.

76. In a lengthy telephone call in the evening of June 21, 2023, Canuteson emphasized how much he valued Plaintiff's contributions at OMH and reiterated his remorse about the extent to which his aggressive pursuit of a sexual relationship with her had caused issues for her in the workplace.

77. The very next day, Canuteson called Plaintiff on her day off and was exceedingly rude and abusive to Plaintiff, including aggressively chastising Plaintiff for stating that she refused to engage in any further sexual interaction with him.

78. During this phone call, Canuteson advised Plaintiff, without any legitimate basis or justification, that he had decided to relieve her of her supervisory responsibilities and would supervise her direct reports himself.

79. Because Plaintiff enjoyed a positive professional relationship with her staff, and because Canuteson had just pledged to be more supportive of her in the workplace, Plaintiff was shocked and angered by Canuteson's decision to strip her of supervisory responsibility.

80. Plaintiff told Canuteson that she thought his decision to remove her supervisory responsibilities was unwarranted and "punitive."

81. Plaintiff also expressly objected to the rude and dismissive manner in which Canuteson treated her on the call.

82. Shortly after the conclusion of that call, Plaintiff texted Canuteson and advised him that she intended to set up a meeting with Human Resources to discuss her workplace issues, including Canuteson's sexual harassment and retaliatory behavior.

83. Approximately an hour after her text to Canuteson advising him of her intent to complain to Human Resources, Plaintiff called Canuteson for a follow up conversation.

84. Canuteson took Plaintiff's call on a speaker phone and advised her that Dan Ragone of OMH's Human Resources department was also on the call.

85. During the call, Ragone told Plaintiff that shortly before she called, Canuteson had advised him that she had voluntarily resigned her employment at OMH earlier that morning.

86. Plaintiff immediately advised Ragone that Canuteson's claim that she had resigned was completely false and that she had no intention of resigning her employment.

87. In response, Ragone abruptly advised Plaintiff that if she refused to resign, then OMH was terminating her employment.

88. Plaintiff was given no rationale for her abrupt termination by either Ragone or Canuteson.

89. After being advised of her termination on the call with Ragone and Canuteson, Plaintiff contacted Human Resources and raised concerns about the legitimacy of her termination.

90. Among other things, Plaintiff noted that she was provided with no substantive explanation for her termination, and that nothing in her performance warranted termination.

91. Ragone responded to this email by claiming that Plaintiff was terminated by OMH due to certain alleged "complaints" about her "interpersonal communication."

92. However, as of the date of her termination, Plaintiff had received overwhelmingly positive feedback from Canuteson about her performance at OMH, including her interpersonal communication skills.

93. In service of its abrupt termination of Plaintiff, OMH retroactively attempted to justify its decision by relying on one purportedly problematic email Plaintiff had sent to a subordinate more than a month ago in May 2023 (the "May 2023 Email").

94. Plaintiff and Canuteson had previously discussed the May 2023 Email and Canuteson had told Plaintiff that the email was not problematic.

95. Plaintiff also noted that the May 2023 Email had not served as a basis for any disciplinary action or performance criticism at or about the time it was sent or discussed with Canuteson.

96. As of her termination by OMH, Plaintiff had not received a formal performance warning from OMH, had not been subject to progressive discipline, and had not otherwise been put on notice that her performance was deemed substandard in any way.

97. Rather than a performance issue having justified OMH's termination of Plaintiff, it is apparent that Canuteson orchestrated the termination of Plaintiff's employment after she made it clear that she would no longer submit to his sexual demands and that she intended to report his conduct to Human Resources.

98. As a consequence of the foregoing, Defendants have discriminated against and retaliated against Plaintiff, including without limitation, subjecting her to a hostile work environment and *quid pro quo* sexual harassment.

99. As a consequence of the foregoing, Defendants have discriminated against and retaliated against Plaintiff in the terms and conditions of her employment.

100. As a consequence of the foregoing, Defendants have substantially interfered with Plaintiff's continuing opportunities for professional advancement, career development, recognition, increased compensation and other benefits and perquisites of employment.

101. As a result of Defendants' discriminatory and retaliatory conduct, Plaintiff has suffered a loss of income, professional stature, and benefits.

102. As a result of Defendants' discriminatory and retaliatory conduct, Plaintiff has sustained serious pain and suffering, and severe mental and emotional harm and distress.

103. The aforesaid acts and conduct by Defendants were performed willfully, intentionally, maliciously and with reckless indifference to Plaintiff's protected rights.

## FIRST CAUSE OF ACTION
*Discrimination on the Basis of Sex in Violation of Title VII Against Defendant New York State Office of Mental Health*

104. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

105. As a result of the aforesaid acts, Defendant New York State Office of Mental Health has discriminated against Plaintiff on account of her sex with respect to the terms, conditions and privileges of her employment, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), including without limitation, by subjecting her to sexual harassment, a hostile work environment and terminating her employment.

106. As a result of Defendant New York State Office of Mental Health's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SECOND CAUSE OF ACTION
*Retaliation in Violation of Title VII Against Defendant New York State Office of Mental Health*

107. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

108. As a result of the aforesaid acts, Defendant New York State Office of Mental Health has retaliated against Plaintiff for opposing discrimination in the workplace in violation of Title VII, 42 U.S.C. § 2000e-3(a), by terminating her employment.

109. As a result of Defendant New York State Office of Mental Health's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## THIRD CAUSE OF ACTION
*Discrimination on the Basis of Sex in Violation of the NYSHRL Against Defendants New York State Office of Mental Health and Matthew Canuteson*

110. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

111. As a result of the aforesaid acts, Defendants New York State Office of Mental Health and Matthew Canuteson discriminated against Plaintiff on account of her sex in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(1)(a), including without limitation, by subjecting her to *quid pro quo* sexual harassment, a hostile work environment and terminating her employment.

112. As a result of Defendants New York State Office of Mental Health and Matthew Canuteson's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## FOURTH CAUSE OF ACTION
*Retaliation in Violation of the NYSHRL Against Defendants New York State Office of Mental Health and Matthew Canuteson*

113. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

114. As a result of the aforesaid acts, Defendants New York State Office of Mental Health and Matthew Canuteson retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(7), by terminating her employment.

115. As a result of Defendants New York State Office of Mental Health and Matthew Canuteson's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## FIFTH CAUSE OF ACTION
*Aiding, Abetting, Inciting, Compelling, and Coercing Discrimination on the Basis of Sex in Violation of the NYSHRL Against Defendant Matthew Canuteson*

116. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

117. As a result of the aforesaid acts, Defendant Matthew Canuteson has knowingly or recklessly aided and abetted the *quid pro quo* sexual harassment, hostile work environment, discrimination, and retaliation against Plaintiff in violation of the New York State Human Rights Law, N.Y. Exec. L. §§ 296(6).

118. As a result of Defendant Matthew Canuteson's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SIXTH CAUSE OF ACTION
*Rape in Violation of N.Y. C.P.L.R. § 213-c Against Defendant Matthew Canuteson*

119. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

120. Defendant Canuteson's assault and battery described above constitutes rape in the first degree as defined by N.Y. Penal Law § 130.35.

121. As a result of Defendant Canuteson's acts, Plaintiff suffered damage, including, without limitation, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

122. Defendant Canuteson's conduct in this regard was willful and/or in reckless disregard to Plaintiff's rights.

## JURY DEMAND

123. Plaintiffs hereby demands a trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that the Court grant judgment for Plaintiff and that it order and award Plaintiff the following relief against Defendants:

(1) A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by Title VII, 42 U.S.C. §2000e *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*;

(2) Actual damages in the form of:

   a. back pay with interest based on Plaintiff's appropriate compensation had she not been wrongfully terminated; and

   b. reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial;

(3)  Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial, but believed to exceed $1,000,000;

(4)  Punitive damages in an amount not less than $2,000,000;

(5)  Statutory attorneys' fees, costs and disbursements;

(6)  Prejudgment interest; and

(7)  Such additional relief as the Court deems just and proper.

Dated: July 15, 2025
New York, New York

BANTLE & LEVY LLP

By: *Robert L. Levy*
Robert L. Levy
99 Park Avenue, Suite 1510
New York, NY 10016
(212) 228-9666
*Attorneys for Plaintiff Jane Doe*